Filed 2/9/16  P. v. Gonzales CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C075968 |
| Plaintiff and Respondent, | (Super. Ct. No. CR124240) |
| v. | |
| JUAN ANTONIO GONZALES, | |
| Defendant and Appellant. | |

Defendant Juan Gonzales appeals from a judgment of conviction for the robbery-murder of Alfonso Prado.  A jury found defendant guilty of first degree murder and found the robbery-murder special circumstance to be true.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)).  Defendant was sentenced to life without the possibility of parole.

On appeal, defendant contends that the trial court abused its discretion by:  (1) admitting evidence that defendant committed a prior robbery as other crimes evidence under Evidence Code section 1101, subdivision (b),[1] to prove identity and common plan or scheme; (2) admitting a booking photograph of defendant, which depicted him with a

---

[1] Undesignated statutory references are to the Evidence Code.

1

bruised eye; (3) denying defendant's *Marsden*[2] motion for substitute counsel based on ineffective assistance of trial counsel; and (4) imposing a parole revocation fine (Pen. Code, § 1202.45) for a life without the possibility of parole sentence.

The parole revocation fine must be stricken. We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Trial Evidence

Prado's girlfriend, Zaidy Calderon, testified that Prado worked at a nightclub, Ortega's West, on the weekends. He would work on Friday, Saturday, and Sunday from 7:00 p.m. to 2:00 a.m. as a bartender, and then he would come back to clean on the mornings of Saturday, Sunday, and Monday from 7:00 a.m. to 1:30 p.m. Calderon often went to help Prado clean in the mornings so that he could finish more quickly, but on the morning of June 18, 2006, she did not go with him. Calderon called Prado at 10:30 a.m. to see when he would be home. Prado told her that he was almost finished and would be arriving home shortly. Calderon tried to contact Prado after that, but he did not answer the phone again.

Hugo Patino, who lived near Ortega's West, testified that on the morning of June 18, he decided to drive to get food. As Patino opened the gate leading to the driveway, he heard a gunshot coming from Ortega's West. He then looked over and saw a man, who appeared to be Hispanic although he only saw the man from behind, open up the door to Ortega's West and drag a body inside.[3] After seeing this, Patino went back to his

---

[2] See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[3] Patino described the suspect he saw from behind as a bald, heavyset man with broad shoulders. Shortly after the incident, Patino was shown a photographic lineup of six men where he identified one of the individuals as the subject. The record is unclear as to where defendant was positioned in this photographic lineup; however, at trial, seven years later, Patino testified that defendant was not the subject he saw because his head and shoulders were not as large. The prosecutor acknowledged in closing argument that

2

home and told his housemate, Manuel, what had happened.[4]  Patino was scared, and neither Patino nor Manuel spoke English so they did not know what to do.  Patino left to purchase his food while Manuel went to look at Ortega's West.  When Patino returned, he learned that a tow truck driver had called the police.

Zolton Zorzi, the tow truck driver, testified that on the morning of June 18, he picked up a vehicle, along with the two passengers of the vehicle, and took it to the tire shop located behind Ortega's West.  When Zorzi arrived at the tire shop and started to unload the vehicle from his tow truck, he noticed that the two passengers had started to act disturbed and anxious.  One of the passengers told Zorzi that there was a "guy with a gun up front."  Zorzi decided it was best to leave, so he got back into his tow truck.  As he was driving away, Zorzi noticed that the door to Ortega's West was open and there was a man lying on the floor just inside the door.  Zorzi parked his truck to get out and get a closer look.  He noticed that the man was not moving, so he called 911.

Officer Mark Martinez testified that he responded to the 911 call about a possible shooting victim at Ortega's West that morning.  When Officer Martinez arrived at the scene, he spoke with Zorzi in the parking lot and then proceeded to search the building.  During his search of the building, Officer Martinez found Prado just inside the door lying on his back with what looked like a gunshot wound to his chest.

Sergeant Thomas Maggiano testified that when he walked inside Ortega's West to investigate, he noticed there were tables and chairs knocked over.  Next to Prado's body, there was a spent nine-millimeter shell casing.  Inside the office, the filing cabinets were left open and three cash register drawers were sitting on top of the office desk.  Prado's

---

there may have been more than one person involved, and the jury was instructed on various aspects of aiding and abetting, and not to speculate as to what happened to other persons who may have been involved.

[4]  In the record, Manuel is sometimes referred to by his nickname, Tijuana.  We refer to him as Manuel.

3

wallet was on the office desk; it appeared undisturbed, but contained no U.S. currency, except possibly a torn bill. Above the desk was a video surveillance system that appeared to be functioning; it depicted the accurate date and time and showed live footage of four different viewpoints throughout Ortega's West. However, there was no videotape inside the surveillance system.

Elias Alvarez, the owner of Ortega's West, testified that he closed the nightclub at 2:00 a.m. on the morning of June 18. After closing, the employees collected the money from the cash registers and counted it. Once the money was counted, Alvarez took the cash home with him, leaving only the change. When Alvarez left Ortega's West that night, the filing cabinets were all closed, the cash register drawers were up on top of the filing cabinet, and the surveillance system had a videotape in the machine and was functioning properly. Alvarez testified that he had never seen defendant before and defendant would have had no reason to go into the office of Ortega's West.

Herb Yip, a crime scene investigator, testified that he located a heart-shaped pendant lying on the floor of the office. Calderon identified this pendant as part of a necklace set she had given Prado as a gift. He wore both that necklace and a bracelet every day. The bracelet and the necklace chain on which Prado wore the pendant were not found at the scene. Gregory Reiber, a forensic pathologist, performed the autopsy of Prado. Reiber testified that, during the autopsy, bruises were discovered on Prado's neck. These bruises could have been inflicted during "the same episode, or incident that resulted in [his] death" and were consistent with a chain necklace being pulled from his neck.

Inside the office, Yip also discovered a brown 9-inch by 12-inch envelope lying on the floor.[5] There was a red stain on the envelope. According to Alvarez, this envelope

---

[5] There were multiple photographs taken of the envelope on the floor inside the office. In a few of the photographs the envelope appears to be in a slightly different position.

4

was kept on top of the filing cabinet next to where the cash register drawers were stored after the nightclub was closed. A swab was taken from the red stain on the envelope and sent to the crime lab.

Jennai Lawson, a senior criminalist, extracted a DNA profile from a swab taken from the envelope. Lawson then entered the DNA profile into CODIS (Combined DNA Index System) to see if she could find a match. The results from CODIS showed a positive DNA profile match to defendant. After receiving a DNA match to defendant, a new sample was collected from him so the crime lab could conduct an additional comparison. Lawson performed an additional comparative analysis and confirmed that the DNA profile from the stain on the envelope matched the known DNA profile of defendant.[6]

Officer Todd Edgerton testified that on June 21, 2006, three days after Prado's murder, he and his partner attempted to conduct a traffic stop on a vehicle. The vehicle did not yield for the officers, so a pursuit resulted. The officers lost the vehicle, but located it a short time later with no passengers inside. As Officer Edgerton and his partner were in the process of towing the vehicle, a man came walking up the street toward the vehicle. When the man noticed the officers' presence, he turned around and began running. As he was running from the officers, the man dropped a pistol. The officers apprehended the man and identified him as Tommy Spencer. Officer Edgerton recovered the pistol, which was booked into evidence. Criminalist Bradley Swanson compared cartridge cases fired from the pistol Spencer had dropped to the cartridge case

---

Yip testified that there was a high volume of foot traffic in the office throughout the investigation, and the movement of the envelope was likely due to someone accidently kicking it.

[6] Defendant's DNA profile is estimated to occur at random among unrelated individual in approximately one in 1.1 sextillion African Americans, one in 1.8 sextillion Caucasians, and one in 560 quintillion Hispanics.

found at Ortega's West. After comparing the cartridge cases, Swanson concluded that the cartridge case found at Ortega's West and the cartridge cases from the gun Spencer dropped came from the same weapon.

Nina Jones, Spencer's mother, testified that her son used to live with her.[7] Defendant lived in the same apartment complex. Jones testified that Spencer and defendant spent time together.

## Verdict and Sentencing

The jury found defendant guilty of first degree murder. The jury also found the special circumstance allegation of robbery to be true. The trial court subsequently sentenced defendant to a prison term of life without the possibility of parole.

## DISCUSSION

### I. Prior Robbery as Other Crimes Evidence

### A. Background and Defendant's Contentions

The prosecutor filed a motion in limine requesting admission of evidence that defendant committed a robbery as other crimes evidence under section 1101, subdivision (b). This prior robbery took place at Danny's Auto Sales (Danny's Auto), which is a car dealership located within 10 miles of Ortega's West. The robbery occurred 10 days before the murder at Ortega's West. Around 4:15 p.m., Saulia Ramirez was working alone in an office at Danny's Auto when a masked male entered the office, pointed a black handgun at her, and demanded money. When Ramirez said she had no money, the man slapped her face twice, pushed her, and ransacked the office. He then grabbed her purse and briefcase, removed the surveillance videotape, and fled. Ramirez recognized defendant as the robber from prior contact with him as a customer.

---

[7] Spencer was unavailable to testify because he died before trial. He was allegedly killed during the commission of a robbery with defendant.

In his written motion, the prosecutor argued that evidence of the prior robbery at Danny's Auto was admissible to prove identity, intent, motive, and common plan or scheme. Defendant opposed the motion in limine, contending the evidence did not meet the preponderance of the evidence requirement under section 1101, subdivision (b). Defendant also argued in his opposition that the evidence should be excluded under section 352 because its production would require undue consumption of time and the evidence was not sufficiently similar to prove identity or common scheme. According to defendant, the evidence was *only* relevant to prove intent relating to the attempted robbery special circumstance, which defendant requested be bifurcated. Defendant contended that the similarities claimed by the prosecutor were not distinctive characteristics but rather were common occurrences in robberies. His opposition explained that during robberies victims are often alone, handguns are often used, violence is common, businesses are often ransacked, and personal items are often taken.

Defendant further argued there were many differences between the two crimes. In the prior robbery, the gun was not fired, the robbery took place in the late afternoon, defendant had prior contact with the victim, and the robber was wearing a mask. Additionally, defendant argues that the prosecution was not sure whether there were two perpetrators at Ortega's West and, at the time of the robbery, Danny's Auto was open for business, but Ortega's West was not.

Before ruling, the trial court noted that the prosecution sought to use the evidence to prove identity, intent, and common plan or scheme. The court found a number of general similarities between the Danny's Auto robbery and the charged crime. The court found that the two crimes occurred close in time and at locations only 10 miles apart. Both crimes involved a handgun. The victim of the robbery at Danny's Auto was physically assaulted, and there was evidence that Prado was assaulted in the present case. The most distinctive similarity between the crimes, according to the court, was that the robber took the surveillance tape in both cases. The court ruled that the robbery at

7

Danny's Auto was distinctively similar to the crime in the present case. The court noted that, while all evidence presented under section 1101, subdivision (b), is going to be prejudicial because it is prior crimes evidence, there was nothing inflammatory about the Danny's Auto robbery making it unduly prejudicial. Consequently, the court ruled the People would be permitted to present evidence regarding the robbery at Danny's Auto.

When the jury instructions were later discussed, the court expressed its intent to give the jury the CALCRIM No. 375 instruction. This instruction informed the jurors that they may use the evidence of the Danny's Auto robbery to decide whether "defendant was the person who committed the offense alleged in this case" and whether "defendant had a plan or scheme to commit the offense alleged in this case." The instruction told the jurors not to use the Danny's Auto evidence for any other purpose. Additionally, the instruction told the jurors that they may *not* conclude from the evidence "that the defendant has a bad character or is disposed to commit crime." Defendant objected, arguing the instruction should limit the use of the evidence to only prove common plan or scheme and not identity. The trial court overruled the objection. In overruling the objection, the court stated, "I would find that both identity and common scheme or plan -- and it's common scheme or plan, presumably not only to establish that the defendant had committed robberies . . . but also that because of the unusual aspects of the robbery at Danny's Auto Sales, it shows it was the defendant who was present at Ortega's and that the defendant's intent was to commit a robbery. [¶] So I find that both of those issues are legitimately before the Court. I would overrule the objection."[8]

---

[8] Despite the fact that the court noted the Danny's Auto evidence was offered by the prosecution to prove intent, as well as identity and common plan or scheme, the court subsequently instructed the jury to consider the evidence for the limited purposes of identity and common plan or scheme, not intent. While the court made reference to intent in its ruling, it does not appear that the trial court specifically ruled on the prosecutor's intent theory.

Defendant contends the trial court abused its discretion in failing to exclude the evidence of the robbery at Danny's Auto as irrelevant and highly prejudicial. He contends the prior crimes evidence is not relevant to prove identity or common plan or scheme because the prior crime is not sufficiently similar to the charged crime. He further contends it is not relevant to prove common plan or scheme because the fact that a robbery was committed in the instant case was beyond dispute, the only issue being the identity of the perpetrator.

### B. Analysis

As a general rule, section 1101, subdivision (a), prohibits the admission of evidence of uncharged misconduct to prove propensity or disposition to commit the charged crime. (§ 1101, subd. (a); see *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*); *People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).) However, section 1101, subdivision (b), provides that such evidence is admissible "when relevant for a noncharacter purpose—that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident.' [Citations.]" (*Hendrix*, at p. 238.) "[T]he admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other § 352 concern). [Citations.]" (*Ibid.*)

The trial court's determination of the admissibility of uncharged misconduct evidence is reviewed for abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citations.]' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329

9

(*Foster*).)  Because this is a very deferential standard of review, " 'discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)

As we shall explain, the trial court did not abuse its discretion in admitting evidence of the Danny's Auto robbery.  Assuming, without deciding, that it was error for the trial court to admit the other crimes evidence to prove identity, the evidence was nonetheless admissible to establish common plan or scheme.  The evidence was material to key disputed facts in the case, probative of defendant's common plan or scheme, and its probative value was not "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)  Moreover, even if the court erred in admitting the evidence to establish identity or common plan or scheme, any error was harmless because the other evidence against defendant was overwhelming.

### 1. Material Purpose

"[T]o satisfy the requirement of materiality, the fact sought to be proved or disproved must be either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred." (*Hendrix, supra*, 214 Cal.App.4th at p. 239.)  Elements of the offense and identity are ultimate facts.  (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017-1018.)  A defendant's common plan or scheme is an intermediate fact.  (*Ibid.*)  The People offered the evidence of the robbery at Danny's Auto for the noncharacter purposes of establishing the identity of defendant as the person who committed the crimes and establishing a common plan or scheme involving the prior crime and the charged crime.

For purposes of deciding the materiality of evidence under section 1101, subdivision (b), a plea of not guilty places all of the elements of the offense in dispute, " 'unless the defendant has taken some action to narrow the prosecution's burden of proof.' " (*Ewoldt, supra*, 7 Cal.4th at p. 400, fn. 4, superseded by statute on other

10

grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) In particular, "a fact—like defendant's intent—generally becomes 'disputed' when it is raised by a plea of not guilty or a denial of an allegation . . . [and] remains 'disputed' until it is resolved." (*People v. Rowland* (1992) 4 Cal.4th 238, 260.) Since defendant did not stipulate that Prado's property was taken, that issue was disputed and the issue of whether there was a robbery was susceptible to proof of a prior crime that shows common plan or scheme. (*Ibid.*; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 23 (*Lindberg*); *People v. Balcom* (1994) 7 Cal.4th 414, 422.) Additionally, defendant was charged with a robbery-murder special circumstance. That allegation requires proof that the robbery be committed independent of and not merely incidental or an afterthought to the murder.

### 2. Relevance and Probative Value

To be relevant to the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts. (*Ewoldt, supra*, 7 Cal.4th at p. 403.) The crimes must share " ' "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." [Citation.]' " (*People v. Leon* (2015) 61 Cal.4th 569, 598 (*Leon*).) " '[A] [common] plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense.' " (*Id*. at pp. 598-599, quoting *Ewoldt*, at p. 403.)

The trial court did not abuse its discretion in concluding that the evidence was relevant to prove defendant's common plan or scheme. In addition, because evidence of prior conduct may be admitted to prove defendant's common plan "regardless of whether it also is relevant to prove the defendant's identity as the perpetrator, we need not decide whether the evidence was admissible to prove defendant's identity." (*Foster, supra*, 50 Cal.4th at p. 1329.)

11

In *People v. Leon*, our high court analyzed whether a trial court erred in admitting prior crimes evidence under section 1101, subdivision (b). (*Leon, supra*, 61 Cal.4th at pp. 594-600.) In that case, the defendant was convicted of multiple counts of murder and robbery related to a month-long crime spree. (*Id.* at p. 576.) At trial, the court admitted evidence of two robberies under section 1101, subdivision (b), to prove common plan and intent. At the preliminary hearing, the defendant had not been held to answer on charges related to those robberies. (*Leon*, at pp. 595-596.) The California Supreme Court held this evidence was properly admitted. (*Id.* at p. 594.) The Court reasoned that the uncharged robberies were sufficiently similar to the charged robberies because both the uncharged robberies and the charged robberies occurred at small stores located in the same general neighborhood. (*Id.* at p. 598.) Additionally, the uncharged robberies occurred only a few days before and after the charged robberies and a gun stolen in one of the uncharged robberies was used to commit some of the charged robberies and the murders. (*Ibid.*)

Here, the similarities between the prior crime and the charged offense indicate the existence of a common plan and establish the substantial probative nature of that evidence. (1) Both crimes were commercial robberies. (2) The robberies occurred close in time, only 10 days apart. (3) Both robberies occurred during the daytime as the robbery at Danny's Auto occurred around 4:15 p.m. and the robbery-murder at Ortega's West occurred around 11:00 a.m. (4) The robbery at Danny's Auto and the robbery-murder at Ortega's West occurred close in proximity, less than 10 miles away from Ortega's West. (5) Both robbery victims, Ramirez and Prado, were employees of a business. (6) Both victims were working alone at business establishments when defendant came to the establishments and committed the crimes. (7) In the robbery at Danny's Auto, defendant demanded money from Ramirez; in the robbery-murder at Ortega's West, the cash drawers were moved, which leads to the inference that the perpetrator was looking for money. Additionally, no usable United States currency was

found in Prado's open wallet, another fact from which it could be inferred that the robber was looking for money. (8) Both establishments were ransacked during the commission of the crimes. (9) Both robberies involved violence and the use of a handgun. (10) In both robberies, defendant took personal items from the victims. (11) And, the most notable similarity, defendant removed the videotape from the surveillance machine before leaving Danny's Auto, and the videotape was also missing from the surveillance machine at Ortega's West. These common features manifest the same general plan to rob and avoid apprehension and therefore support a finding that defendant acted in accordance with that plan in the charged offense.

Further, the differences between the robbery at Danny's Auto and the charged crime do not make that prior robbery inadmissible. Defendant contends that any probative value of the other crimes evidence was minimized by differences between the charged crimes and the prior crime. He points out, inter alia, in the robbery at Danny's Auto, the gun was not fired, the robbery took place in the late afternoon, the robber was wearing a mask, defendant had prior contact with the victim, and the business was open. He additionally notes that the prosecution "was not sure whether one or two perpetrators committed the charged murder, whereas there was only one perpetrator of the dealership robbery." Defendant argues that the prior-crimes evidence is inadmissible to prove common plan or scheme because of these differences. We disagree.

While there are differences between the Danny's Auto robbery and the Ortega's West robbery-murder, the differences are insignificant, especially in light of all the similarities. Defendant points out that the gun was not fired in the robbery at Danny's Auto; however, in that robbery the victim did not put up a fight, so defendant did not need to fire the gun to complete the robbery. Conversely, at Ortega's West, defendant's own blood was shed and there were tables and chairs overturned. From these facts, it can be inferred that the victim resisted the robbery. Thus, the fact that the gun was only fired

13

at Ortega's West is an insignificant distinction. What is of more significance is that a gun was used in both cases.

Further, defendant points out that the robbery-murder at Ortega's West occurred in the morning while the robbery at Danny's Auto occurred in the afternoon. This is also an insignificant difference. The timing of the robberies might have more significance as a dissimilarity if one was a nighttime robbery and the other a daytime robbery as that would show a plan by one robber to take advantage of the cover of darkness. However, both robberies in this case were daytime robberies, which is more significant than the fact that one was in the morning and the other in the afternoon.

Additionally, defendant argues that the perpetrator at Ortega's West was not wearing a mask; however, there is no evidence in the record establishing that the perpetrator was not wearing a mask inside the bar. The eyewitness, Patino, only saw a perpetrator from behind when that person was outside the building. There is no way to know whether he or anyone else involved in the robbery was or was not wearing a mask when the victim was confronted inside of Ortega's West. Consequently, this dissimilarity is not supported by the evidence. Likewise, the contention that defendant had prior contact with Danny's Auto, but not with Ortega's West, is unsupported by the evidence. Although Alvarez testified that he had never seen defendant before, this does not establish that defendant had never been in the nightclub. We conclude that the purported dissimilarities not supported by evidence in the record carry little to no weight and do not nullify the similarities that are supported by evidence in the record.

Defendant further points out that the prosecution was not sure whether there were two perpetrators of the Ortega's West robbery-murder. Yet, while this crime could have been committed by more than one person, that fact is insignificant on the question of whether the crime was committed pursuant to defendant's common plan or scheme. Defendant points out that Danny's Auto was open for business when it was robbed and Ortega's West was not. He argues this is important because customers could be expected

14

to be at Danny's Auto, but not Ortega's West. However, the fact that one business was open and the other was not is an insignificant difference, because the evidence shows a plan to rob employees who were alone in the business.

As explained above, for evidence to be relevant to prove a common plan or scheme, there need only be evidence to support the inference that defendant employed a plan in committing the charged offense. (*Ewoldt, supra*, 7 Cal.4th at p. 403.) The crimes need not be unique or identical. Here, the 11 similarities between the robbery at Danny's Auto and the charged crime tend to show the existence of a plan, rather than a series of spontaneous acts. The evidence tended in reason to prove that defendant committed the robbery at Ortega's West pursuant to that plan and that he took Prado's personal property as part of that plan. Thus, the evidence was highly probative because the jury could reasonably infer from the similarities that defendant harbored a "general plan" to rob the business, rob the employees of their personal, and then evade apprehension by taking the surveillance recordings in each instance. (*Leon, supra*, 61 Cal.4th at p. 598.)

### 3. Prejudicial Effect and Cumulativeness

Our conclusion that defendant's prior crime was relevant to prove that defendant had a common plan and had substantial probative value does not end our inquiry. To be admissible, such evidence "must not contravene other policies limiting admission, such as those contained in [] section 352. [Citations.]" (*People v. Thompson* (1988) 45 Cal.3d 86, 109.) Section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "The governing test [under section 352] evaluates the risk of '*undue*' prejudice, that is, ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues," ' not the prejudice 'that naturally flows from relevant, highly probative evidence.' [Citations.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 925,

15

overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)
"Evidence is not inadmissible under section 352 unless the probative value is
'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice
or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155,
167.)

Here, the tendency of the prior offenses to establish defendant's general plan in the
charged offense is strong. His prior robbery provides persuasive proof that, when he
came to Ortega's West, he had the general plan to ransack the establishment when a lone
employee was working, use a gun and violence against the employee, steal the business's
money and the employee's personal effects, and take the video surveillance footage
before leaving to prevent his later identification and apprehension. As the trial court
indicated, there was nothing inflammatory about the robbery at Danny's Auto. The
victim, although she was slapped on the cheek twice and pushed, was not shot and was
not injured. Moreover, the jury was instructed not to consider the Danny's Auto robbery
evidence to prove defendant was a person of bad character and not to use that evidence
for any other purpose, thereby minimizing the potential for improper use. We presume
the jury followed this limiting instruction. (See *Lindberg, supra*, 45 Cal.4th at pp. 25-26;
*People v. Panah* (2005) 35 Cal.4th 395, 492.)

In addition, the evidence is not merely cumulative of other evidence concerning
defendant's actions upon entering Ortega's West, because the balance of the evidence
does not render his actions beyond dispute. " '[I]f it is beyond dispute that the alleged
crime occurred,' evidence of uncharged conduct to demonstrate a common design or plan
'would be merely cumulative and the prejudicial effect of the evidence of uncharged acts
would outweigh its probative value.' " (*Foster, supra*, 50 Cal.4th at p. 1331.) To prove
robbery, the prosecution had to prove that property was taken. While there was
circumstantial evidence indicating that jewelry was taken from Prado, it was not beyond
dispute that such was the case. Also, to prove the robbery-murder special circumstance,

16

the prosecution had to prove that defendant intended to commit robbery independent of the killing. The court instructed the jury that if they found defendant "only intended to commit murder and the commission of [r]obbery was merely part of or incidental to the commission of that murder, then the case enhancement has not been proven." The Danny's Auto robbery evidence showed that defendant had a common design or plan to steal when he went to Ortega's West. Thus, that evidence assisted the prosecution in proving the robbery and the special circumstance because it tended to show that property was taken and that the robbery was not incidental to the murder or merely an afterthought to killing Prado for some other purpose.

In sum, we conclude the trial court did not abuse its discretion in determining that the evidence reflected similarities between the prior crimes and the charged offenses sufficient for the evidence to be relevant to and probative of defendant's common plan in committing the charged offenses. We also uphold the trial court's exercise of discretion in determining that the probative value of the evidence was not substantially outweighed by the risk of undue prejudice.

### 4. Identity Theory and Instruction - Harmless Error

As in *Foster*, any error in admitting the evidence for the purpose of proving identity and so instructing the jury was harmless. (*Foster, supra*, 50 Cal.4th at p. 1332.) In *Foster*, a robbery-murder case, the court observed, "We need not decide whether the prior crimes were sufficiently similar to the charged offenses to be relevant to the issue of identity, because any error in the court's instruction was harmless." (*Ibid.*) The court reasoned that the jury would have heard the other crimes evidence anyway because it was also admissible to prove common plan or scheme and intent and the evidence of defendant's guilt was overwhelming. (*Ibid.*) Likewise, as we explain, any error related to the introduction of the Danny's Auto robbery for purposes of proving identity (or common plan or scheme) and so instructing the jury is also harmless.

17

Defendant urges that the prejudicial effect of the purported error must be measured under the constitutional *Chapman* standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)  However, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense.  Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.  [Citations.]' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)  Therefore, as our high court has said, error in admitting prior-crimes evidence is subject to the standard of review articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Malone* (1988) 47 Cal.3d 1, 22.)  Under the *Watson* standard, prejudicial error is shown where " 'after an examination of the entire cause, including the evidence,' [the court is] of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)  "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Here, the jury was going to hear the evidence related to the Danny's Auto robbery because, as we have said, it was admissible to prove common plan or scheme.  Thus, as in *Foster*, any error related to admitting the evidence to prove identity is harmless.

Moreover, also like in *Foster*, the evidence connecting defendant to the crimes for which he was convicted was extremely compelling.  Defendant's DNA was found on a blood-stained envelope at the crime scene.  Alvarez, the owner of Ortega's West, testified that the envelope was always stored next to the cash drawers on top of the filing cabinet

18

in the office. After the murder, detectives discovered the cash drawers on top of the desk and the envelope lying on the floor in the office that was ransacked at Ortega's West.

Defendant was also connected to the murder through the gun used to kill Prado. Detectives found a bullet casing near Prado's body. Three days later, a person with whom defendant associated, Spencer, dropped a gun while running from police. That gun ejected the shell casing found at the murder scene.

Defendant argued that, absent the other crimes evidence, the verdict would have been more favorable to him because he did not match Patino's description of the assailant, defendant was not with Spencer when the murder weapon was apprehended, and defendant's fingerprints were not found at the scene. Defendant further argues that once the jury heard the other crimes evidence, the jury would have been "swayed to believe [defendant] was predisposed to commit robbery and committed the instant crime." We disagree. Although Patino's description did not match that of defendant exactly, the fact remains that defendant's DNA was found in blood at the scene, where other evidence circumstantially suggested the victim resisted the robbery. Any inference from Patino's description that defendant was not involved is weak in the face of this evidence.

When considered in total, even without the other crime evidence, the evidence overwhelmingly establishes defendant's guilt. We conclude that even if the trial court erred in admitting the evidence under either the identity or common plan or scheme theory, any error was harmless.

## II. Admission of Photograph

### A. Background and Defendant's Contentions

During the trial, the prosecutor sought to admit a booking photograph of defendant showing defendant with a bruise around his eye. Detective Ed Hensley testified that he located this photograph in the CalPhoto database, a database of pictures. When the prosecution asked Detective Hensley when the photograph was entered into the database,

defense counsel objected to lack of foundation and hearsay.  The trial court overruled the objections.  Detective Hensley testified the photograph was entered into the system on June 24, 2006.  This would have been six days after the robbery-murder at Ortega's West, which occurred on June 18, 2006.

During the examination of Dr. Reiber, the pathologist who conducted the autopsy on Prado, the prosecution drew his attention to the photograph of defendant with a bruised eye and asked if he could render an opinion as to the age of the bruise. Dr. Reiber testified that the bruise was anywhere from "a number of hours to perhaps a very few days old, probably not more than two or three days."  He reasoned that the bruise was a very bright purple, which tends to show it was not just a few minutes old because it had time to develop.  Further, beyond the two to three day range, the color in the bruise tends to dull, so he opined that it was likely no older than that.

When exhibits were discussed near the end of trial, defendant objected to the photograph as irrelevant based on Dr. Reiber's testimony as to the likely age of the bruise.  He argued that because the murder took place on June 18, 2006, six days before the photograph was entered into the database, Dr. Reiber's testimony regarding the age of the bruise made the photograph irrelevant.  The trial court overruled the objection and admitted the photograph into evidence.  At the conclusion of the trial, the jury was instructed that it was not required to accept the opinions of expert witnesses as correct.

On appeal, defendant contends that the trial court erred in admitting the photograph because it was irrelevant, "as the evidence showed the injuries to [defendant's] eye occurred after the date Prado was killed."  The People respond that the evidence was relevant because the healing of a bruise is a matter of common experience and the jurors were instructed that they were not required to accept Dr. Reiber's opinion; accordingly, the jurors could have rationally concluded the bruise was older than Dr. Reiber opined.

## B. Analysis

Only relevant evidence is admissible. (§ 350.) " 'Relevant evidence' means evidence, . . . having *any* tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210, italics added.) A trial court has broad discretion in determining whether evidence is relevant. (*People v. Robinson* (2005) 37 Cal.4th 592, 625-626.) Here, the photograph of defendant with a bruised eye was entered into the photograph database six days after the murder of Prado. Dr. Reiber testified the bruise was likely no more than two or three days old, but his testimony was not dispositive. The jury could have reasonably determined the bruise was older and in fact resulted from a struggle between defendant and Prado. Additionally, any shortcomings related to expert interpretation of evidence went to the weight of the evidence and expert opinion, not to its admissibility. (*People v. Smithey* (1999) 20 Cal.4th 936, 966; *People v. Stevey* (2012) 209 Cal.App.4th 1400, 1414, 1417-1419.) There was evidence that the victim had resisted the perpetrator. Chairs and tables had been overturned. Defendant's blood was shed at the scene. Given the evidence of resistance by the victim, the photograph had a tendency in reason to prove a disputed fact of consequence in this case, specifically defendant's identity as the perpetrator. We conclude the trial court did not abuse its discretion in admitting the photograph.

Furthermore, even if the trial court did err in admitting the photograph of defendant with a bruised eye, the error was harmless. As we have noted, "[T]he application of ordinary rules of evidence does not implicate the federal Constitution . . . ." (*People v. Harris* (2005) 37 Cal.4th 310, 336.) Thus, any error in admission of the photograph should be evaluated under the *Watson* standard. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) As explained *ante*, the evidence against defendant was overwhelming and, even without the photograph depicting defendant with a bruised eye, was sufficient evidence under which a rational jury could have convicted defendant. Further, the prosecution did not even mention the photograph in their initial closing

21

argument. It was not until rebuttal that the prosecutor addressed the photograph and, even then, only gave it a passing reference, telling the jury that it was for them to decide whether defendant got the bruise in the present incident or from something else. Accordingly, any error in admitting the evidence was harmless.

Defendant further contends that, even if this error was not prejudicial in and of itself, "the error in admitting the photographs into evidence was cumulatively prejudicial with the error in admitting the evidence regarding the Danny's Auto Sales robbery . . . ." We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) Any errors here "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no errors or prejudice when considering defendant's claims separately. Viewed cumulatively, our conclusion is the same. The evidence against defendant was overwhelming, and he has failed to demonstrate prejudice. Accordingly, defendant was not deprived of a fair trial.

### III. *Marsden* Motion

### A. Background and Defendant's Contentions

### 1. Pretrial *Marsden* Motion

On September 4, 2013, defendant filed a pretrial *Marsden* motion seeking removal of his defense attorney on the grounds that, inter alia, he failed to investigate DNA evidence. The trial court held a hearing on the motion. At this hearing, defendant argued that his counsel had failed to investigate the DNA on the envelope. He argued that the crime scene investigator behaved in a suspicious manner when he failed to take pictures of the location in which the envelope was found at the crime scene, failed to swab the envelope at the crime scene, and then failed to place the envelope in the freezer on the day it was discovered. Defense counsel responded by stating that many of the issues

22

raised by defendant would be addressed via in limine motions or at trial. He further stated that, if the crime scene investigator had mishandled the evidence, it would be impeachment material for the defense. After hearing from defendant and defense counsel, the trial court denied the *Marsden* motion. The court reasoned that defense counsel was a very experienced criminal lawyer and that his pretrial decisions indicated his expertise in handling serious criminal cases. Defense counsel did not raise all the issues defendant requested before trial, but the court reasoned this was a tactical decision.

### 2. *Marsden* Motion for the Purpose of a Motion for a New Trial

On February 11, 2014, after the jury found defendant guilty of first degree murder and found the special circumstances to be true, defendant filed a handwritten letter to the presiding judge informing him that he would like to file a *Marsden* motion. On February 19, defendant filed a second letter informing the judge that he was also planning on filing a motion for a new trial based on ineffective assistance of counsel. On March 3, defendant filed the *Marsden* motion for substitution of counsel as well as a handwritten motion for a new trial titled, "Requesting New Trial with Supporting Declaration Including Marsden Motion Hearing." On appeal, defendant focuses on three of the claims he made in his motion: defense counsel had failed to (1) investigate or litigate issues concerning evidence tampering and the DNA evidence; (2) adequately impeach crime scene investigator Yip; and (3) secure and present experts on crime scene investigation and DNA. Defendant asserted that detectives did not follow proper procedures in handling and preserving the DNA on the envelope and, as a result, that evidence should have been excluded at trial. Further, defendant argued he had a right to have an expert witness appointed by the court to challenge the handling of the DNA evidence but was denied this right due to ineffective counsel. Defendant reiterated the same points in his new trial motion.

The trial court held a hearing on defendant's *Marsden* motion. At the hearing, defendant argued that the DNA on the envelope was not his and that the police planted it

to frame him. He stated that he told this to his defense counsel and requested that his counsel file a motion to exclude the envelope due to bad faith and evidence tampering, but counsel "failed to build a foundation under law to exclude this piece of evidence." In response, defense counsel stated that he had attended DNA seminars and has a basic understanding of DNA evidence. He read through all of the reports and lab notes and did not find any irregularities. Counsel further stated that he went to the police department to look at the envelope in person and did not find any irregularities there either. During trial, he cross-examined the detective and elicited as much information regarding mishandling evidence and crime scene contamination as possible.

After hearing arguments from defendant and defense counsel, the trial court denied the *Marsden* motion. The court reasoned that it was clear there was a "fundamental dispute" between defendant and defense counsel about how the case should be tried, but that "does not constitute ineffective assistance of counsel." The court further stated that "[i]t is the responsibility of an experienced trial attorney to determine what evidence should be presented." There was nothing to suggest defense counsel did an inadequate job in presenting the defense in the case. After denying defendant's *Marsden* motion, the court denied defendant's new trial motion. The court reasoned the verdict was "not contrary to law or the evidence presented in the case and that there is no newly discovered evidence which would warrant a new trial."

On appeal, defendant contends the trial court abused its discretion when it denied defendant's "*Marsden* motion for substitute counsel for purposes of making a new trial motion." He argues that "appointment of substitute counsel was warranted to evaluate a new trial motion based on whether counsel's performance was deficient in not obtaining a DNA expert as a consultant to assist counsel in reviewing the DNA evidence against [defendant] . . . ."

24

**B. Analysis**

"Ineffective assistance of counsel is the underlying plank which supports the *Marsden* rule." (*People v. Maese* (1980) 105 Cal.App.3d 710, 723 (*Maese*).) A party is entitled to discharge his appointed counsel only if the record clearly shows counsel is not providing adequate representation or that the defendant and counsel have become so embroiled in conflict that ineffective representation will likely result. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085 (*Barnett*).) This standard applies postconviction. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89 (*Sanchez*); *People v. Smith* (1993) 6 Cal.4th 684, 696 (*Smith*).) Defendant has the burden of making the required showing. (See *People v. Bills* (1995) 38 Cal.App.4th 953, 961 [criminal defendant bears the "heavy burden" of establishing inadequate representation so great as to substantially impair defendant's right to the effective assistance of counsel].)

In defendant's opening brief, he contends that the trial court erred in denying his *Marsden* motion for substitute counsel for purposes of making a new trial motion. He argues, citing *Smith*, that he is entitled to "the effective assistance of counsel for purposes of making a motion for new trial based on his trial attorney's ineffective assistance." According to defendant, new counsel should have been appointed to "evaluate a new trial motion based on whether counsel's performance was deficient in not obtaining a DNA expert as a consultant to assist counsel in reviewing the DNA evidence." However, to the extent that defendant contends *Smith* supports his argument that new counsel should have been appointed solely for this purpose, he misstates the holding in *Smith*. In *Smith*, our high court held that, when a *Marsden* motion is granted, "new counsel is substituted for *all purposes* in place of the original attorney, who is then relieved of further representation." (*Smith, supra*, 6 Cal.4th at p. 695, italics added.) After appointment, new counsel could then investigate whether to pursue a motion for a new trial, but whether such motion should actually be made is to be determined by the new attorney. (*Id.* at pp. 695-696.) In *Sanchez*, our high court again emphasized the *Smith* holding that

25

substitute counsel should not be appointed solely to investigate defendant's proposed new trial motion. (*Sanchez, supra*, 53 Cal.4th at p. 89.)

Postconviction, defendant simultaneously filed a *Marsden* motion and a separate motion for a new trial based on ineffective assistance of counsel. From defendant's opening brief, it seems that his intention in filing the two motions was to file a *Marsden* motion for the purpose of bringing a new trial motion. However, the proper procedure is not to file a *Marsden* motion for purposes of making a new trial motion, as defendant argues he did in his opening brief. (*Sanchez, supra*, 53 Cal.4th at p. 89.) Consequently, the trial court properly reviewed the two motions separately, ruling on the *Marsden* motion first before turning to the new trial motion.

We review the trial court's denial of a *Marsden* motion for abuse of discretion and will find such an abuse where the client has shown that the failure to replace appointed counsel would substantially impair his or her right to assistance of counsel. (*Barnett, supra*, 17 Cal.4th at p. 1085; *Smith, supra*, 6 Cal.4th at p. 696.) To the extent there was a credibility question between the client and counsel at the hearing, the trial court is entitled to accept counsel's explanation. (*Smith*, at p. 696.) In assessing counsel's representation, consideration must be given to counsel's role. It is settled California law that appointed counsel has both the authority and the duty to control the proceedings, the scope of which includes such matters as deciding what witnesses to call, whether and how to conduct cross-examination, what motions to make, and most other strategic and tactical decisions. (*People v. McKenzie* (1983) 34 Cal.3d 616, 631; *In re Kerry O.* (1989) 210 Cal.App.3d 326, 333; *Maese, supra*, 105 Cal.App.3d at pp. 723-724.) A client has no right to an attorney who accedes to all of the client's whims. (*Barnett*, at p. 1096.)

Defendant asserts that defense counsel could not make a strategic decision without the assistance of an expert in this case. He cites the observation in *Strickland v. Washington* (1984) 466 U.S. 668, 690-691 [80 L.Ed.2d 674, 695], that "a strategic choice made after an incomplete investigation is reasonable only 'to the extent that reasonable

professional judgments support the limitations on investigation.' " However, defendant merely speculates as to how an expert consultant would have been able to aid defense counsel in making his decisions. Defendant asserts that an expert witness could have pointed out the fact that the envelope with the DNA on it was not frozen quickly enough, but he had not said how this would have adversely affected the DNA for testing purposes. Quite the contrary, Lawson testified at trial that a sample can degrade if not stored properly and as a result, genetic information could be lost, making the DNA harder to detect. However, degradation does not change the genotypes to something different. Furthermore, according to Lawson, the lack of refrigeration here did not result in degradation and she was able to obtain a full single source profile, which indicated the sample quality was sufficient for analysis.

Additionally, defendant's argument invites us to speculate that defense counsel did not possess the necessary knowledge or expertise to make the strategic decision on his own. Since there is no evidence supporting that assertion in the record, we decline to find that he did not have the ability to make such a strategic decision.

Further, there are " 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 106 [178 L.Ed.2d 624, 643].) "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." (*Ibid.*) Additionally, counsel is entitled to formulate a strategy that appears reasonable at the time and may balance limited resources with effective trial tactics and strategies. (*Id.* at p. 107.) Here, there were multiple ways in which defense counsel could have handled the case. One of those ways may have been calling an expert witness, but that was not the sole option. Defense counsel made the tactical decision to bypass calling an expert witness because, from his experience, he felt an expert would not aid the case. Choosing this approach did not render his assistance ineffective.

We hold the trial court did not abuse its discretion in denying the *Marsden* motions. The trial court thoroughly explored the reasons for defendant's dissatisfaction with appointed counsel, giving him several opportunities to articulate his concerns. The trial court listened to defendant's arguments and reviewed all evidence admitted by defendant during the hearings. After hearing arguments on both sides, the court noted that there was a dispute between defendant and counsel as to how the case should be tried, but that did not constitute ineffective assistance of counsel. We have reviewed the record and find nothing that would undermine the trial court's conclusion.

## IV. Parole Revocation Fine

At sentencing, the court imposed a $200 restitution fine under Penal Code section 1202.4 and a separate $200 parole revocation fine under Penal Code section 1202.45. Defendant contends the parole revocation fine should be stricken. The People agree, and so do we.

Penal Code section 1202.45 requires a parole revocation fine "in every case where a person is convicted of a crime and his or her sentence includes a period of parole." Here, the only sentence imposed by the trial court was life imprisonment without the possibility of parole. It is well-settled that it is improper to impose a parole revocation fine when a defendant's only sentence is life without the possibility of parole. (*People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183; cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine must be imposed and stayed when the defendant is sentenced to determinate term sentences in addition to life without the possibility of parole].) Thus, defendant's parole revocation fine should be stricken.

## DISPOSITION

The judgment is modified by striking the parole revocation fine imposed under Penal Code section 1202.45. The trial court shall prepare an amended abstract of judgment that deletes the parole revocation fine and forward a certified copy of the

28

amended abstract to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

                                        <u>      MURRAY        </u>, J.

We concur:

<u>      NICHOLSON          </u>, Acting P. J.

<u>      ROBIE               </u>, J.